JS - 6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MIRNA E. PEREIRA, individually and on behalf of other persons similarly situated,<br><br>     Plaintiff,<br><br>   vs.<br><br>GATE GOURMET, INC.<br><br>     Defendant. | CASE NO. 08-07469 MMM (PJWx)<br><br>ORDER REMANDING ACTION TO LOS ANGELES SUPERIOR COURT FOR LACK OF SUBJECT MATTER JURISDICTION |

## I.  FACTUAL BACKGROUND

Mirna Pereira filed this putative class action in Los Angeles Superior Court on October 8, 2008.[1]  The complaint pleads two causes of action: (1) failure to pay wages in a timely fashion following termination in violation of California Labor Code §§ 201 and 202 and (2) unfair competition in violation of California Business and Professions Code § 17200.  Defendant Gate

---

[1] See Class Action: Complaint for Damages and Restitution (1) Failure to Pay Wages Timely Upon Termination in Violation of Labor Code § 201 et seq. (2) Unfair Competition in Violation of Bus. and Prof. Code § 17200 ("Complaint"), Exh. A to Notice of Removal of Action Pursuant to 28 U.S.C. §§ 1332, 1441, 1446, 1453 [Class Action Fairness Act] ("Notice of Removal"), Docket No. 1 (Nov. 12, 2008).

Gourmet, Inc., removed the action to federal court on November 12, 2008,[2] invoking diversity jurisdiction under 28 U.S.C. §§ 1332, 1441, 1446, and 1453.[3]

On December 8, 2008, the court issued an order to show cause why the action should not be remanded to state court for lack of subject matter jurisdiction, citing deficiencies in Gate Gourmet's notice of removal regarding the alleged amount in controversy ("December 2008 OSC").[4]  Gate Gourmet filed a brief on December 15, 2008.[5]  Pereira responded on December 22, 2008.[6]

On January 26, 2009, the court issued a second order to show cause why the action should not be remanded to state court for lack of subject matter jurisdiction, citing deficiencies in Gate Gourmet's response to the first order to show cause ("January 2009 OSC").[7]  Gate Gourmet filed a brief on February 4, 2009.[8]  Pereira responded on February 11, 2009.[9]

---

[2]Defendant was served with summons and complaint on October 13, 2008, and removed within thirty days, satisfying 28 U.S.C. § 1446(b).  (Notice of Removal, ¶¶ 2-3.)

[3]See Notice of Removal, ¶¶ 1-8.

[4]Order to Show Cause Why Action Should Not Be Remanded to State Court for Lack of Subject Matter Jurisdiction ("December 2008 OSC"), Docket No. 13 (Dec. 8, 2008).

[5]Memorandum in Support of Removal under the Class Action Fairness Act ("Gate Gourmet Resp."), Docket No. 15 (Dec. 15, 2008).

[6]Plaintiff's Response to Defendant Gate Gourmet Inc.'s Memorandum in Support of Removal ("Pereira Opp."), Docket No. 18 (Dec. 22, 2008).

[7]Order to Show Cause Why Action Should Not Be Remanded to State Court for Lack of Subject Matter Jurisdiction ("January 2009 OSC"), Docket No. 20 (Jan. 26, 2009).

[8]Defendant Gate Gourmet, Inc.'s Supplemental Memorandum of Points and Authorities in Support of Removal under the Class Action Fairness Act ("Supp. Gate Gourmet Resp."), Docket No. 23 (Feb. 4, 2009).

[9]Plaintiff's Response to Defendant Gate Gourmet, Inc.'s Supplemental Memorandum of Points and Authorities in Support of Removal under the Class Action Fairness Act ("Second Pereira Opp."), Docket No. 25 (Feb. 11, 2009).

## II.  DISCUSSION

**A.    Legal Standard Governing Removal Jurisdiction Under the Class Action Fairness Act**

The December 2008 OSC set forth the legal standard governing removal jurisdiction under the Class Action Fairness Act ("CAFA"); that discussion is incorporated in this order by reference.  In the December order, the court explained that the Ninth Circuit "strictly construe[s] the removal statute against removal jurisdiction," and thus that "[f]ederal jurisdiction must be rejected if there is any doubt as to the right of removal in the first instance."  *Gaus v. Miles, Inc.*, 980 F.2d 564, 566 (9th Cir. 1992) (citing *Boggs v. Lewis*, 863 F.2d 662, 663 (9th Cir. 1988), *Takeda v. Northwestern Nat'l Life Ins. Co.*, 765 F.2d 815, 818 (9th Cir. 1985), and *Libhart v. Santa Monica Dairy Co.*, 592 F.2d 1062, 1064 (9th Cir. 1992)).  "The 'strong presumption' against removal jurisdiction means that the defendant always has the burden of establishing that removal is proper."  *Id.* (citing *Nishimoto v. Federman-Bachrach & Assocs.*, 903 F.2d 709, 712 n. 3 (9th Cir. 1990) and *Emrich v. Touche Ross & Co.*, 846 F.2d 1190, 1195 (9th Cir. 1988)).

CAFA does not disturb the traditional rule that the burden of establishing that removal is proper is on the proponent of federal jurisdiction.  *Abrego Abrego v. The Dow Chemical Co.*, 443 F.3d 676, 685 (9th Cir. 2006) ("We . . . hold that under CAFA the burden of establishing removal jurisdiction remains, as before, on the proponent of federal jurisdiction").

Where, as here, a complaint does not specify the amount in controversy, the removing defendant must prove, by a preponderance of the evidence, that the jurisdictional amount is met.  See, e.g., *Korn v. Polo Ralph Lauren Corp.*, 536 F.Supp.2d 1199, 1205 (E.D. Cal. 2008) ("In addition to the contents of the removal petition, the court considers 'summary-judgment-type evidence relevant to the amount in controversy at the time of removal,' such as affidavits or declarations.  *Valdez v. Allstate Ins. Co.*, 372 F.3d 1115, 1117 (9th Cir. 2004) (internal quotations omitted). . .").[10]

_____

[10]See also, e.g., *Harrington v. Mattel, Inc.*, C07-05110 MJJ, 2007 WL 4556920, *3 (N.D. Cal. Dec. 20, 2007) ("Because it is not clear from the face of the complaint if the jurisdictional

**B.    Whether Defendant Has Established That Removal is Proper**

**1.    Defendant's Notice of Removal**

Under California Labor Code § 203, when an employee is discharged or resigns, an employer who fails to timely pay wages owed to that individual is liable for a penalty amounting to one day of pay for each day the wages are late, up to a maximum of 30 days.  See CAL. LAB. CODE § 203 ("If an employer willfully fails to pay, without abatement or reduction, in accordance with Sections 201, 201.5, 202, and 205.5, any wages of an employee who is discharged or who quits, the wages of the employee shall continue as a penalty from the due date thereof at the same rate until paid or until an action therefor is commenced; but the wages shall not continue for more than 30 days").  The complaint alleges violations of Labor Code §§ 201-202[11] and requests damages in the form of waiting time penalties pursuant to § 203.[12]

In its notice of removal, Gate Gourmet multiplied the class members' average hourly wage

---

amount in controversy is met, Defendants have the burden to prove, by a preponderance of the evidence, that the amount exceeds $5 million [citing *Matheson v. Progressive Specialty Ins. Co.*, 319 F.3d 1089, 1090 (9th Cir. 2003) ("Where it is not facially evident from the complaint that more than $75,000 is in controversy, the removing party must prove, by a preponderance of the evidence, that the amount in controversy meets the jurisdictional threshold")]"); *Sanchez v. Wal-Mart Stores, Inc.*, Civ. S-06-cv-2573 DFL KJM, 2007 WL 1345706, *1 (E.D. Cal. May 8, 2007) ("In her complaint, Sanchez does not allege a specific amount of damages.  Therefore, this court has jurisdiction only if defendants establish by a preponderance of the evidence that potential damages exceed $5,000,000"); *Davis v. Chase Bank U.S.A., N.A.*, 453 F.Supp.2d 1205, 1208 (C.D. Cal. 2006) ("Where the complaint does not specify the amount of damages sought, the removing defendant must prove by a preponderance of the evidence that the amount in controversy requirement has been met. . . .  Under this standard, the defendant must provide evidence that it is more likely than not that the amount in controversy satisfies the federal diversity jurisdictional amount requirement. . . .  In its discretion, a district court may accept certain post-removal admissions as determinative of the amount in controversy" (citations and quotation marks omitted)).

[11]Labor Code §§ 201-202 specifies that discharged employees are entitled to payment of earned and unpaid wages immediately upon termination; that employees who gave at least 72 hours notice before resigning are entitled to earned and unpaid wages on their last day of work; and that employees who resigned without notice are entitled to earned and unpaid wages within 72 hours of their resignation.  (Complaint, ¶ 14.)

[12]Complaint, Prayer for Relief at 7.

of $10.17[13] by an eight (8) hour work day,[14] for 30 days of waiting time.[15]  It then multiplied this number by 3,716, the number of individuals it believes are in the putative class.[16]  Based on this

---

[13]Declaration of Carmen Ehlers in Support of Defendant's Removal of Action Pursuant to 28 U.S.C. §§ 1332, 1441, 1446, 1453 [Class Action Fairness Act] ("Ehlers Removal Decl."), ¶ 5 ("The average hourly rate of the 3,716 former California employees identified above is $10.17 per hour").

[14]The complaint contains no allegations regarding the average number of hours per day that Gate Gourmet employees work.  The December 2008 OSC noted that Gate Gourmet had simply assumed an eight-hour work day, without adducing evidence of this fact.  In support of its response, Gate Gourmet submitted the declaration of its current payroll manager, who stated that Gate Gourmet's California employees work an average of eight hours per day. (See Supplemental Declaration of Carmen Ehlers in Support of Defendant Gate Gourmet, Inc.'s Memorandum of Points and Authorities in Support of Removal Under the Class Action Fairness Act, ¶ 2.)

[15]3,716 potential class members x $10.17 per hour x 8 hours per day x 30 days' waiting time penalty = $9,070,012.80.

[16]Although the complaint alleges that the class consists of "not less than 400" members, it includes:
"All persons who:
1)    Resigned employment with Gate Gourmet in California without giving 72 hours notice of resignation on or after October 5, 2004 through the date Notice is mailed to the Class;
2)    Resigned employment with Gate Gourmet in California on or after October 8, 2004 through the date Notice is mailed to the class, who had given at least 72 hours Notice of their resignation; and
3)    Gate Gourmet discharged in California on or after October 8, 2004 through the date Notice is mailed to the Class." (Complaint, ¶ 9.)
With its notice of removal, Gate Gourmet submitted the declaration of a payroll specialist who stated that approximately 3,716 former Gate Gourmet employees fall into one or more of these categories. (Ehlers Removal Decl., ¶ 4.)  Although it is possible that the final wages of some number of this group were timely paid, Pereira's proposed class definition does not limit class membership to those who did not receive their final wages in a timely fashion; this is apparently because Pereira asserts that Gate Gourmet's payroll policies and practices necessarily prevent it from making timely payment. (Complaint, ¶ 10(c) ("Plaintiff is informed and believes and thereon alleges that Gate Gourmet has payroll policies and practices that necessarily cause it to not timely pay Class members final wages due upon the end of their employment. . . .  Plaintiff is informed and believes, and thereon alleges, that Defendant[ ] paid all former employees in the class for their last day of work, on the Friday of the week following the week in which they stopped working").)  Given this allegation, it is appropriate for present purposes to assume that there are 3,716 people in the putative class.

1   calculation, Gate Gourmet alleged that the amount in controversy is approximately $9,070,012.[17]

2   ## 2.    The Court's December 2008 Order to Show Cause

3   In its December 2008 order to show cause, the court noted that Gate Gourmet assumed that

4   each class member would be entitled to waiting time penalties for the entire thirty-day statutory

5   period.  Because Pereira's complaint alleged that defendant "paid all former employees in the

6   class for their last day of work . . . on the Friday of the week following the week in which they

7   stopped working,"[18] the court noted that it appeared individual class members would be eligible

8   at most for *ten* days of statutory penalties under § 203.[19]  Even if every member of the class were

9   entitled to recover ten days of waiting time penalties, the court observed, the amount in

10  controversy would be only $3,023,337.60.[20]   Because CAFA requires that the amount in

11  controversy be at least $5,000,000, the court expressed doubt as to whether it had subject matter

12  jurisdiction to hear the action.

13  In its response to the December 2008 OSC, Gate Gourmet asserted that Pereira's complaint

14  contained "inconsistent allegations."[21]  Although acknowledging that Pereira alleged that it paid

15  former employees "on the Friday of the week following the week in which they stopped

16  working,"[22] Gate Gourmet noted that the complaint also asserted that "Plaintiff and members of

17  the Class are entitled to one day of pay for each day wages paid to them, post-termination, were

18

---

19  [17]Notice of Removal, ¶ 19.

20  [18]Complaint, ¶ 10(c).

21  [19]If the individual resigned or was discharged on a Monday and paid the following Friday,
22  she would be entitled to ten days of statutory penalties under § 203.  See CAL. CODE CIV.
23  PROC. § 12 ("Computation of time.  The time in which any act provided by law is to be done is
    computed by excluding the first day, and including the last, unless the last day is a holiday, and
24  then it is also excluded"); CAL. GOV'T. CODE § 6800 (same).

25  [20]3,716 potential class members x $10.17 per hour x 8 hours per day x 10 days' waiting
26  time penalties = $3,023,337.60.

27  [21]Gate Gourmet Resp. at 2.

28  [22]Complaint, ¶ 10(c).

late, from the day their earned and unpaid wages were due until paid, up to a maximum of 30 days."[23]  Gate Gourmet argued that the two allegations "le[d] to two different calculations as to the amount in controversy," and that, since the amount in controversy "is to be estimated [ ] on the assumption that a jury would return a full verdict for the plaintiff class on all claims made in the complaint," it was entitled to assume that the amount in controversy exceeds $9 million.[24]  See *Korn*, 536 F.Supp.2d at 1205 ("In measuring the amount in controversy, the court must assume that the allegations of the complaint are true and that a jury will return a verdict for the plaintiff on all claims made in the complaint").  Gate Gourmet asserted that this conclusion was further supported by Pereira's refusal to stipulate that she sought a maximum of ten days' penalties per class member.[25]  Taken together, it contended that the facts sufficiently established subject matter

---

[23]*Id.*, ¶ 17.

[24]Gate Gourmet Resp. at 1-2.

[25]*Id.* at 4.  Gate Gourmet submitted a copy of a letter from plaintiff's counsel with its response, in which counsel explained that "[t]he reference to thirty days in the [c]omplaint was not to suggest that 30 days in penalties are owed to all the class members," but rather that thirty days "is the limit of waiting time penalties that can be paid to any class member."  (*Id.*, Exh. B at 2.)  Conceding the possibility "that in a class of over 3000 persons, a few class members were paid thirty or more days late," counsel refused to stipulate to a limitation on the maximum waiting time penalties class members could recover.  (*Id.* ("Prior to discovery, I cannot know that no one was paid over ten days late; therefore, I cannot enter into the stipulation you proposed.  I find it extraordinary that you would think that I would even consider the stipulation you suggested without any proof that no putative class member was paid more than 10 days late.  My co-counsel, me and my firm take our obligation to putative class members very seriously").)

A plaintiff's refusal to stipulate that the amount in controversy is below the necessary threshold is not sufficient to establish the requirement.  See, e.g., *Conrad Associates v. Hartford Accident & Indemnity Co.*, 994 F.Supp. 1196, 1199 (N.D. Cal. 1998) ("Defendant's assertion that it is 'conclusively established' that the amount in controversy in this case exceeds $75,000 by plaintiff's refusal to stipulate that the case is not worth $75,000 is not convincing.  First, defendant cites no cases permitting such a conclusion from a failure to so stipulate.  Two cases in this district have expressly declined to find that a refusal to stipulate to damages below the jurisdictional amount is even persuasive in evaluating the worth of the claims in a complaint.  See *Valle v. State Farm Mutual Automobile Ins.*, 1997 WL 564047 (N.D. Cal. 1997) and *Miller v. Michigan Millers Ins. Co.*, 1997 WL 136242 (N.D. Cal. 1997).  Moreover, since a defect in subject matter jurisdiction cannot be stipulated to or waived, attempting to force the plaintiff to enter a stipulation regarding the potential amount of damages would serve no effect in determining

1    jurisdiction under *Korn*.

2    ### 3.    The Court's January 2009 Order to Show Cause

3    As detailed in its January 2009 OSC, the court found these arguments unpersuasive.  First,

4    it found *Korn* factually and legally distinguishable, as it involved a statute that set forth a

5    maximum statutory penalty *amount*.  By contrast, this case involves a statute that sets forth a

6    maximum statutory *time period* over which penalties may accrue; the total amount of such

7    penalties is contingent both on each plaintiff's daily wage and on the number of days payment was

8    delayed.[26]

9    Second, the court observed that, in light of plaintiff's allegation that "*as a matter of custom*

10   *and practice*, Gate Gourmet paid employees who resigned or were terminated the week following

11   their separation from the company . . . ," Gate Gourmet, as the proponent of federal jurisdiction,

12   had to adduce evidence that it was "*more likely than not* that a sufficient number of putative class

13

14   _____

15   the actual amount in controversy at the time of removal.  See, e.g., *Angus v. Shiley, Inc.*, 989
     F.2d 142 (3d Cir. 1993)"); see also *Bassel v. 4Access Communications Co.*, No. CV 07-2346 L
16   (JMA), 2008 WL 2157005, *3 (S.D. Cal. May 21, 2008) ("Defendant also argues that plaintiffs
     refused to stipulate that their claims do not exceed $75,000.  But plaintiffs' refusal to so stipulate
17   is insufficient to establish the amount in controversy [quoting *Conrad Associates*].  The burden
     is on defendant, not the plaintiffs, to prove the amount in controversy.  If a plaintiff's refusal to
18   stipulate is sufficient to satisfy that burden, a defendant could force the plaintiff to choose between
     stipulating against his or her future remedies and remaining in federal court").
19

20   [26]January 2009 OSC 6 ("*Korn*, however, is inapposite.  There, plaintiff alleged that each
     class member was entitled to civil penalties under California Civil Code § 1747.08.  *Korn*, 536
21   F.Supp.2d at 1206.  That statute provides for a maximum penalty of $1,000 per violation, which
     plaintiff sought in his complaint.  *Id.*  As a consequence, and because defendant had submitted a
22   declaration stating that it had processed more than 5,000 credit card transactions in California
     during the preceding year, the district court held that the amount in controversy requirement under
23   CAFA had been satisfied.  *Id.* ('Because plaintiff alleges in his complaint that defendant is liable
     for up to $1000 per violation of § 1747.08 in the processing of credit card purchases and returns,
24   and because defendant has proffered evidence that it has processed more than 5,000 credit card
     transactions, Polo has demonstrated by a preponderance of the evidence that the amount in
25   controversy exceeds $5,000,000').  In contrast to Civil Code § 1747.08, California Labor Code
     § 203 establishes a statutory maximum *time period* over which penalties can accrue; the specific
26   *amount* of such penalties is dependent on each class member's wage and the number of days the
     defendant delayed in making the payment due").
27

28

members [were] entitled to recover more than ten days of waiting time penalties" to show that the amount in controversy was at least $5,000,000.[27]

Finally, the court reiterated the standard of proof governing CAFA removals.  While acknowledging Gate Gourmet's argument that it need not "research, state, and prove the plaintiff's claims for damages" to satisfy the preponderance of the evidence standard, the court noted that "a court 'cannot base [its] jurisdiction on a [d]efendant's speculation and conjecture.'" *Korn*, 536 F.Supp.2d at 1204-05 (citing *McCraw v. Lyons*, 863 F.Supp. 430, 434 (W.D. Ky. 1994)); *id.* at 1205 (quoting *Lowdermilk v. United States Bank Nat'l Ass'n*, 479 F.3d 994, 1002 (9th Cir. 2007)).  Rather, a removing defendant "must set forth the underlying facts supporting its assertion that the amount in controversy exceeds the statutory minimum." *Id.* (citing *Gaus*, 980 F.2d at 567).  Because Gate Gourmet relied exclusively on a calculation that assumed all class members would be entitled to penalties for the maximum statutory period[28] – without adducing evidence to establish that this was more likely than not – the court concluded that it had not carried its burden of proof with respect to subject matter jurisdiction.

### 4.    Defendant's Response to the January 2009 OSC

The only new argument Gate Gourmet advances in its response to the court's January 2009 OSC is the assertion that Pereira's allegation that Gate Gourmet "paid all former employees in the class for their last day of work . . . on the Friday of the week following the week in which they

---

[27]*Id.* at 6-7 ("This is particularly true since under Ninth Circuit precedent, the removal statutes are strictly construed").  As noted, plaintiff concedes that in a class encompassing more than 3,000 members, some individuals may be entitled to recover *more* than ten days' worth of waiting time penalties.  It is also possible, however, that some individuals will be entitled to *fewer* than ten days' worth of waiting time penalties.  As the removing party, defendant bears the burden of establishing by a preponderance of the evidence that enough putative class members were entitled to recover sufficient daily waiting time penalties to satisfy the $5 million amount-in-controversy requirement.

[28]The court did not decide whether such a calculation would have sufficed under the preponderance standard had Pereira not alleged that the company "paid all former employees in the class for their last day of work . . . on the Friday of the week following the week in which they stopped working." (*Id.* at 7.)

stopped working" is untrue.[29]  In support of this contention, Gate Gourmet proffers the declaration of Joe Navarro, director of human resources for the company's western region.[30]  Navarro states that Gate Gourmet "does not currently have, and over the last five years has not had, a policy, practice, or custom of paying its former employees for their last day of work on the Friday of the week following the week in which they stopped working."[31]  Gate Gourmet argues that "[o]nce Plaintiff's unsupported and untrue allegation concerning Gate Gourmet's final pay practices is disregarded, the only relevant allegation as to the aggregate amount in controversy is Paragraph 17 of the Complaint, which alleges that 'Plaintiff and members of the Class are entitled to one day of pay for each day wages paid to them, post-termination, were late, from the day their earned and unpaid wages were due until paid, up to a maximum of 30 days.'"[32]  On this basis, Gate Gourmet once again calculated the amount in controversy by assuming that all class members did not receive the wages to which they were entitled for at least thirty days after they stopped working.[33]

_____

[29]Supp. Gate Gourmet Resp. at 2 ("Plaintiff's allegation is not based on any underlying factual evidence but merely upon 'information and belief.'  Indeed, Plaintiff was not a high level executive, manager, or even a long-term employee who may have had access to Gate Gourmet's final pay customs and practices").

[30]See Declaration of Joe Navarro in Support of Defendant Gate Gourmet, Inc.'s Supplemental Memorandum of Points and Authorities in Support of Removal under the Class Action Fairness Act ("Navarro Decl."), Docket No. 24 (Feb. 4, 2009).

[31]*Id.*, ¶ 4.

[32]Supp. Gate Gourmet Resp. at 3.

[33]*Id.* at 4.  Gate Gourmet asserts that the court's earlier conclusion that it had not adequately established subject matter jurisdiction was based on the fact that it "had not yet disputed Plaintiff's allegation that it was Gate Gourmet's custom and practice of paying employees their final pay the week following their separation from the company."  (*Id.* at 1-2.)  The court, however, did not rely on Gate Gourmet's failure to dispute Pereira's allegation that, as a matter of custom and practice, employees were paid on the Friday of the week following the week in which they stopped working.  Rather, it concluded that Gate Gourmet had not affirmatively shown by a preponderance of the evidence that the amount in controversy exceeded $5,000,000.  In this regard, it is to be assumed, in the normal case, that a defendant disputes the primary allegations

1    This argument is unavailing.  In evaluating diversity jurisdiction, "[t]he critical inquiry is

2    the amount placed in controversy *by the allegations in plaintiff's complaint*."[34]  *Korn*, 536

3    F.Supp.2d at 1206 n. 4.  Accordingly, Gate Gourmet needed to produce enough evidence to

4    show, by a preponderance, that a sufficient number of class members were entitled to more than

5    ten days' worth of statutory penalties under § 203 to surpass the $5 million amount-in-controversy

6    threshold.  In its response to the January 2009 OSC, it has once again failed to do so.

7    Gate Gourmet's reliance on *Navarro v. Servisair, LLC*, No. C 08-02716 MHP, 2008 WL

8    3842984 (N.D. Cal. Aug. 14, 2008) is similarly misplaced.[35]  There, the district court permitted

9    the removing defendant to calculate § 203 waiting time penalties for the full thirty day period

10    because plaintiff alleged that putative class members' wages remained *unpaid*.  *Id.* at 8-9.  Here,

11    by contrast, plaintiff's proposed class includes individuals whose wages *were paid*, albeit late.[36]

12    The full thirty-day penalty period did not necessarily run for any, much less all, putative class

13    members.[37]

14    It is of course true that a removing defendant is not responsible for "conduct[ing] a fact-

15

16

17    of a plaintiff's complaint.  This fact, however, does not render those allegations irrelevant for
purposes of calculating the amount in controversy.

18

19    [34]Defendant is aware of this rule, having relied on the premise in its response to the
December 2008 OSC.  (Gate Gourmet Resp. at 1-2 ("In short, the ultimate inquiry is what

20    maximum amount is put 'in controversy' by the claims in the complaint, not what a defendant will
likely end up actually owing (if anything)" (footnote omitted)).

21

22    [35]Supp. Gate Gourmet Resp. at 4.

23    [36]Second Pereira Opp. at 8-9 ("In direct contrast to *Navarro*, here, [d]efendant has paid
[p]laintiff her wages, just roughly one week late.  On behalf of herself and the putative class,

24    [p]laintiff seeks section 203 continuation wages from the date [d]efendant should have paid final

25    wages to the date it actually paid former employees such wages.  Because plaintiff alleges such
wages were paid, it does not follow that every single class member is automatically entitled to the

26    maximum 30 days of continuation wages.  On the contrary, the analysis here depends on the
number of days [d]efendant [generally] delayed in making the payment due").

27

28    [37]There is in fact unrefuted evidence that at least one plaintiff – namely, Pereira – received
her wages in far fewer than thirty days post-termination.

1   specific inquiry into whether the rights of each and every potential class member were violated,"

2   answering "the ultimate question the litigation presents," or "try[ing] the case [itself] for the

3   purposes of establishing jurisdiction." *Bryan v. Wal-Mart Stores, Inc.*, No. C 08-5221 SI, 2009

4   WL 440485, *3 (N.D. Cal. Feb. 23, 2009).  Nonetheless, in evaluating whether a party has met

5   its burden of proof with respect to jurisdiction, several circuits have held that it is proper for

6   district courts to consider which party has access to or control over the records and information

7   required to determine whether the amount in controversy requirement is met.  See, e.g., *Amoche*

8   *v. Guarantee Trust Life Insurance Co.*, 556 F.3d 41, 51 (1st Cir. 2009) ("[D]eciding whether a

9   defendant has shown a reasonable probability that the amount in controversy exceeds $5 million

10  may well require analysis of what *both* parties have shown. . . . In the course of that evaluation,

11  a federal court may consider which party has better access to the relevant information.  See *Evans*

12  *v. Walter Indus., Inc.*, 449 F.3d 1159, 1164 n. 3 (11th Cir. 2006) ('Defendants have better access

13  to information about conduct by defendants, but plaintiffs have better access to information about

14  which plaintiffs are injured and their relationship to various defendants')"); *Brill v. Countrywide*

15  *Home Loans, Inc.*, 427 F.3d 446, 447-48 (7th Cir. 2005) ("That the proponent of jurisdiction

16  bears the risk of non-persuasion is well established. . . .  Whichever side chooses federal court

17  must establish jurisdiction; it is not enough to file a pleading and leave it to the court or the

18  adverse party to negate jurisdiction. . . .  And the rule makes practical sense.  If the burden rested

19  with the proponent of remand, then Countrywide could have removed without making any effort

20  to calculate its maximum exposure, and without conceding that it had faxed thousands of ads.

21  That would have thrown on Brill the burden of showing that Countrywide could not possibly have

22  sent more than 3,333 junk faxes. . . .  Brill would have no way to show this early in the litigation,

23  and plaintiffs in other kinds of suits would encounter similar difficulty.  When the defendant has

24  vital knowledge that the plaintiff may lack, a burden that induces the removing party to come

25  forward with the information – so that the choice between state and federal court may be made

26  accurately – is much to be desired").

27        Here, Gate Gourmet is the party best positioned to adduce evidence regarding its conduct.

28  In support of its notice of removal, Gate Gourmet could have proffered evidence regarding its

1  actual policies or practices in order to counteract Pereira's allegations.  It could have conducted

2  a sampling or other analysis demonstrating that it was more likely than not that a sufficient

3  number of class members were not paid for thirty days after the date wages were due that more

4  than $5,000,000 was at issue.  Adducing such evidence would not have required that Gate

5  Gourmet prove Pereira's case or answer the "ultimate question" presented by this litigation.

6  Despite two opportunities to do so, however, Gate Gourmet failed to do any of these things.

7  Consequently, the court must conclude that it has not carried its burden of proof regarding subject

8  matter jurisdiction.  As a result, remand is appropriate.  Cf. *Miedema v. Maytag Corp.*, 450 F.3d

9  1322, 1330-32 (11th Cir. 2006) ("In order to establish the amount in controversy, Maytag's notice

10  of removal relied upon Jodi Jarrett's declaration that 'a total of 6,279 of the models of

11  ranges/ovens identified in paragraph 22 of the Complaint were sold in Florida,' and '[t]he total

12  value of those ranges/ovens is $5,931,971.' . . .  As the district court pointed out, Jarrett's

13  declaration offered no explanation as to how she arrived at the conclusion that the 6,729

14  range/oven units had a 'total value' of $5,931,971.  It appears from Jarrett's deposition that she

15  was provided with the most recent manufacturer's suggested retail price ('MSRP') for each model

16  type at issue, but it is unclear whether those MSRPs would in any way reflect the compensatory

17  damages, interest, and costs that Miedema seeks.  Furthermore, Jarrett's statement that 6,729 of

18  the range/oven models at issue were 'sold' in Florida is not based on actual sales data.  As

19  Jarrett's deposition reveals, that figure is merely a guess based on (1) Maytag's receipt of a total

20  of 2,943 product registrations from Florida customers for the range/oven models at issue, and

21  (2) Maytag's estimate that, nationwide, only about 43.6% of the units it manufactures are

22  registered by consumers.  Even if we assume that this kind of estimation is reliable, it presumes

23  that the rate of registration by Florida consumers closely parallels Maytag's national average.

24  Given the particular facts and circumstances of the instant case the district court did not err when

25  it found that 'great uncertainty' remained about the amount in controversy, resolved that

26  uncertainty in favor of remand, and concluded that Maytag had not established, by a

27  preponderance of the evidence, that the amount in controversy exceeded $5,000,000.

28  Accordingly, remand for lack of subject matter jurisdiction was appropriate" (footnote omitted));

*Chochorowski v. Home Depot USA*, 585 F.Supp.2d 1085, 1093 (E.D. Mo. 2008) ("As a threshold matter, the Court interprets the petition to seek damages only for Missouri residents who rented a tool or equipment from Home Depot and paid the 'Damage Waiver' prior to Home Depot's amendment of the rental agreement.  The petition defines the 'Damage Waiver' as [an] automatic up-charge of ten percent on a rental that was not part of 'applicable sales and rental taxes' and that Home Depot did not disclose as a[n] optional charge.  Paragraphs 37 through 42 of the petition assert that as a result of this litigation, Home Depot changed its business practices relating to Damages Waivers during 2005 or 2006, and now uses a new version of the rental agreement which offers 'optional' 'Damage Protection' that is no longer automatically imposed on customers. The petition specifically limits the scope of its claims [to claims based on the prior Damage Waiver practice]. . . .  It is clear to the Court that plaintiff does not seek damages with respect to the new rental agreement or 'Damage Protection' coverage.  As a result, defendant's calculation of plaintiff's compensatory damages from 1999 to the present is over-inclusive and cannot be accepted.  Although Home Depot had the opportunity to provide the Court with actual revenue figures based on its sale of Damage Waivers, it did not do so.  Thus, Home Depot fails to provide evidence to support its calculation of compensatory damages. . . .  Defendant's compensatory damage calculation therefore lacks the necessary detail required to establish the $5 million jurisdictional requirement, as it is based on vague and conclusory assertions that do not satisfy the preponderance of the evidence standard" (citations omitted)).[38]

------

[38]See also *Myrick v. Nationwide Mutual Insurance Co.*, No. C07-1778MJP, 2008 WL 53183, *2 (W.D. Wash. Jan. 3, 2008) ("The only evidence Defendant points to is the Davis Declaration, in which Ms. Davis, a 'Senior Trainer/Development Instructor' at Nationwide, states that from January 2002 through the present, 'Nationwide made PIP payments to Washington insureds and later recovered in excess of $7,000,000 of these PIP payments.' . . . But as Plaintiff point out, this evidence does not address the claims as pled in Plaintiff's complaint.  Plaintiff only seeks recovery for those PIP payments Nationwide sought to recover *where its insureds had not been made whole by third party tortfeasors*.  Defendant does not argue or present any evidence suggesting that the subset of recovered PIP payments focused on in Plaintiff's complaint is equal to the total number of PIP payments Nationwide actually recovered.  If some of the $7,000,000 in PIP payments recovered by Nationwide were from insureds that had previously been made whole by third party tortfeasors, those recoveries would not be included within the recoveries at

14

### III. CONCLUSION

For the reasons stated, the court remands this case to Los Angeles Superior Court forthwith.

DATED: April 30, 2009

_Margaret M. Morrow_
MARGARET M. MORROW
UNITED STATES DISTRICT JUDGE

---

issue in this case . . . .  The Court will not speculate as to what percentage of the $7,000,000 in payment recoveries actually fall within the purview of Plaintiff's claims" (emphasis original; footnote and citation to record omitted)).  The *Myrick* court cited *Lowdermilk* in declining to speculate as to whether or not the amount in controversy had been satisfied, noting that, although "*Lo[w]dermilk* employed a stricter 'legal certainty' standard than [the preponderance of the evidence standard] in effect here," "[e]ven under the more lenient preponderance of the evidence standard, Nationwide's evidence and reasoning fall[ ] short." *Id.* at *2 n. 2.  See also, e.g., *Madlock v. Farmers Insurance Co., Inc.*, No. 07-CV0703-CVE-PJC, 2007 WL 4554186, *3 (N.D. Okla. Dec. 19, 2007) ("Farmers asserts that the amount in controversy is established by plaintiff's claim for punitive damages, which are limited by Oklahoma law to $100,000, or the amount of actual damages awarded. . . . [I]n this case, defendant merely asserts that because plaintiff has a claim for punitive damages, which may give rise to a punitive award of *up* to $100,000, the amount in controversy exceeds $75,000.  This argument overlooks defendant's burden of establishing federal jurisdiction by a preponderance of the evidence" (citations omitted)); *Nowak v. Innovative Aftermarket Systems, L.P.*, No. 4:06CV01622 ERW, 2007 WL 2454118, *5 (E.D. Mo. Aug. 23, 2007) ("Here, similar to the defendant in [*Lowdermilk*], the Court believes Defendant IAS's first calculation lacks the detail required to establish the $5,000,000 jurisdictional requirement.  Defendant IAS erroneously relies on the class representatives' average claim amount to calculate the other class members' actual damage amount.  Defendant IAS's calculation is based on conjecture and cannot satisfy the preponderance of the evidence standard. . . . Thus, because Defendant IAS's first calculation offers no evidence indicating the actual number of persons that are potential class members, nor the exact damage amount for each of those persons, the Court finds that Defendant IAS's calculation is based on mere speculation and does not prove, by a preponderance of the evidence, that the amount in controversy exceeds the jurisdictional requirement").